**GOVERNMENT NATIONAL MORTGAGE ASSOCIATION,**
**Plaintiff-Appellant,**

v.

**Tyre Lee TERRY, Individually, and in his capacity of Clerk, Superior Court of Cobb County, Georgia, et al., Defendants-Appellees.**

No. 77–1785.

United States Court of Appeals,
Fifth Circuit.

Dec. 20, 1979.

---

Leonard Schaitman, Frank A. Rosenfeld, Attys., Appellate Sections, Civ. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Dana L. Jackel, Marietta, Ga., for defendants-appellees.

Before GOLDBERG, RONEY and FAY, Circuit Judges.

GOLDBERG, Circuit Judge:

We are confronted with a question of first impression which is quite simply stated and intuitively resolved, but unfortunately much less easily placed within the relevant statutory framework. We must determine whether the Government National Mortgage Association (Ginnie Mae) is an agency for purposes of 28 U.S.C.A. § 1345 and thus able to sue as a plaintiff in federal district court solely on the basis of that status.

In this case Ginnie Mae has sued to recover its loss that allegedly resulted from an error committed by the defendant, Tyre Lee Terry, Clerk of the Superior Court of Cobb County, Georgia, or by one of the defendant's employees. In 1952, a security deed to the property at issue was executed to the Roy D. Warren Company. This mortgage was in turn sold to Ginnie Mae's predecessor, the Federal National Mortgage Association (Fannie Mae).[1] Ginnie Mae alleged that on March 22, 1965, the Cobb County Clerk's Office erroneously recorded that the security deed had been satisfied. Thus, when Jack H. and Carolyn J. Pickelsimer purchased the property in 1971, Ginnie Mae's lien was not on record, and the Pickelsimers took the property free of Ginnie Mae's interest. The Pickelsimers have since defaulted on the mortgage, but, given the sale coupled with the recording error, Ginnie Mae cannot foreclose on the property. Ginnie Mae thus seeks to recoup its loss from the Cobb County Clerk's Office by invoking the agency jurisdiction of the fed-

---

1. The tangled relationship between the old Fannie Mae, the new Fannie Mae, and Ginnie Mae is discussed in section II B, *infra*.

eral district court that is provided by 28 U.S.C.A. § 1345.[2]

The district court held that it did not have jurisdiction over this action. It stated four reasons to support this holding. First, the district court ruled that although Ginnie Mae is controlled and directed by the Secretary of the Department of Housing and Urban Development (HUD), the United States does not possess the requisite proprietary interest to bring the corporation within the purview of section 451. The district court believed that this result obtained because Ginnie Mae's management and liquidation functions are financed through borrowings from the Treasury which are repaid through "private financing."

Second, the court concluded that 28 U.S.C.A. § 1349[3] limits the reach of 28 U.S.C.A. § 1345. In the court's view, since no stock in Ginnie Mae has been issued, it cannot be a corporation in which "the United States is the owner of more than one-half of its capital stock." 28 U.S.C.A § 1349 (West 1976). As a result, the court held that section 1349 prohibits jurisdiction in this case.

Third, the district court concluded that section 1345 cannot grant jurisdiction in this case because Ginnie Mae is not specifically designated an "agency" in its enabling legislation.

Fourth, the district court ruled that Ginnie Mae is acting as the representative for Fannie Mae in this action. Since, in the court's view, a federal corporation may not invoke federal jurisdiction in cases in which it is acting in such a representative capacity, there can be no agency jurisdiction in this case.

We find that the court below was incorrect on each reason for its holding that there was no federal jurisdiction in this case. Accordingly, we reverse.

### I.

■ The last two reasons for the district court's holding that it lacked jurisdiction give us little pause, and rejecting them is no big feat. First, Congress need not label an entity "an agency" in order to entitle that organization to invoke the jurisdiction granted by section 1345. An entity is an agency for purposes of section 1345 because it satisfies the definition of agency provided by section 451. If agency status could be attained only because Congress attached that label to an entity, section 451 would be superfluous.

Second, Ginnie Mae is not suing in this case as the representative of Fannie Mae, but as the owner of the mortgage allegedly eliminated because of the error of the Cobb County Clerk's Office. It is true that the mortgage was originally sold to Fannie Mae in 1952 and that it was therefore part of Fannie Mae's management and liquidation portfolio. See 12 U.S.C. § 1721 (1952). However, in 1968, Fannie Mae's management and liquidation portfolio was transferred to Ginnie Mae. See 12 U.S.C.A. § 1717(a)(2)(A) (West 1969) ("Government National Mortgage Association . . . shall retain the assets and liabilities acquired and incurred under sections 1720 and 1721 of this title prior to such effective date

---

**2.** 28 U.S.C.A. § 1345 (West 1976) provides the following: "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

An "agency" is defined by 28 U.S.C.A. § 451 (West 1968): "The term 'agency' includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in

which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense."

**3.** 28 U.S.C.A. § 1349 (West 1976) provides the following: "The district courts shall not have jurisdiction of any civil action by or against any corporation upon the ground that it was incorporated by or under an Act of Congress, unless the United States is the owner of more than one-half of its capital stock."

. . . .").  Ginnie Mae is thus suing on its own behalf.[4]

## II.

The first two bases for the district court's holding require more extensive discussion. While it is clear that Ginnie Mae is expressly authorized to sue within the meaning of section 1345, see 12 U.S.C.A. § 1723a(a) (West 1969), it is less obvious that it is an agency for the purpose of that section. Furthermore, in making this determination, while it is certain that Ginnie Mae is a corporation within the meaning of section 451, see 12 U.S.C.A. § 1717(a)(2)(A) (West 1969), it is less than settled that the United States has the requisite proprietary interest in Ginnie Mae to satisfy that section. To resolve these uncertainties, we must first explore the "proprietary interest" requirement of section 451 and then, in order to determine whether such an interest exists, turn to an examination of the history of the functions, financing, and management of the old Fannie Mae, the new Fannie Mae, and Ginnie Mae.

## A.

Cases like this one involving federally-chartered corporations in which no stock has been issued, such as Ginnie Mae, present a somewhat ironic difficulty.  Section 451 requires that the United States possess a proprietary interest in these entities in order for them to qualify as agencies for the purposes of Title 28.  Common sense would tell us that the United States possesses such an interest: since no stock or other form of equity financing has ever been issued to the public, if the United States does not own Ginnie Mae, who does? However, creatures of the judiciary, along with all members of the legal community, are loathe to rely upon common sense alone; we find comfort in our decisions most often in reasoned authority.  Yet, we find little chance for such solace here.  To determine if the United States has a proprietary interest in Ginnie Mae, we would normally divine the source of its capitalization.  But such an attempt poses the very difficulty we face: there is no capitalization at all, for no equity interests have ever been issued.

Fortunately, Congress has rescued us from our dilemma.  As noted by the court in *Acron Investments, Inc. v. Federal Savings and Loan Insurance Corp.*, 363 F.2d 236 (9th Cir.), cert. denied, 385 U.S. 970, 87 S.Ct. 506, 17 L.Ed.2d 434 (1966), the reviser's notes to section 451 direct our attention to 18 U.S.C.A. § 6 as a means to interpret the term "agency."[5]  The reviser's notes to 18 U.S.C.A. § 6 inform us of the following:

---

4. Since we have concluded that Ginnie Mae is not suing as the representative of Fannie Mae, we do not express any opinion as to the district court's statement that "[e]ven where there is a grant of jurisdiction over actions to which a government-created corporation is a party, it has been limited to exclude those cases in which the corporation is acting in a representative capacity for a private party, as opposed to acting on its own claim, absent other grounds of federal jurisdiction."

5. The reviser's notes to section 451 state that "[t]he definitions of agency and department conform with such definitions in section 6 of revised Title 18, Crimes and Criminal Procedure.  80th Congress House Report No. 308."

   The district court concluded that *Acron Investments, supra*, was overruled *sub silentio* by *Hancock Financial Corp. v. Federal Savings and Loan Insurance Corp.*, 492 F.2d 1325 (9th Cir. 1974).  We disagree.  Both cases dealt with issues of federal jurisdiction involving the Federal Savings and Loan Insurance Corpora-tion (FSLIC), a governmental corporation in which no stock has ever been issued.  In *Acron Investments* the court, relying on the reviser's notes, found that the FSLIC was an agency for purposes of section 1345.  Thus, the FSLIC was a proper plaintiff in federal district court. In contrast, in *Hancock Financial* the FSLIC was the *defendant* in federal district court. Since section 1345 grants jurisdiction only over suits commenced by the United States or a federal agency, neither section 1345 nor section 451 was involved in the case or ever mentioned by the court.  *Hancock Financial* held only that, because there was no stock to be owned in the FSLIC, the United States could not own more than one-half of the corporation's capital stock as required by 28 U.S.C.A. § 1349. Therefore, the court held that there could be no federal question jurisdiction under 28 U.S.C.A. § 1331(a).  Although we seriously question the validity of this holding, see note 10 *infra*, it is not pertinent to the question whether a govern-mental corporation is an agency under section 1345.  *See* section III *infra*.

The phrase "corporation in which the United States has a proprietary interest" is intended to include those governmental corporations in which stock is not actually issued, as well as those in which stock is owned by the United States. It excludes those corporations in which the interest of the Government is custodial or incidental. 80th Congress House Report No. 304.

Accordingly, since Ginnie Mae is a governmental corporation in which stock has not been issued, our task is to determine whether the interest of the United States is not incidental. To make this determination, we now turn our attention to the functions, financing, and management of Ginnie Mae and the other members of its family tree.

### B.

The federal intervention in the housing market began with the National Housing Act of 1934. *See* 48 Stat. 1246 (1934). Although this Act authorized the creation of private national mortgage associations to engage in secondary market activity, subject to Federal Housing Association (FHA) supervision, *see* 48 Stat. 1252 (1934), it did not contain any explicit authorization for the creation of a federal mortgage association. Nevertheless, by the use of an implicit authorization in 1938 amendments to the National Housing Act, *see* Section 4 of the National Housing Act Amendments of 1938, 52 Stat. 23 (1938), the Federal National Mortgage Association (Fannie Mae) was created as a subsidiary of the Reconstruction Finance Corporation (RFC). In 1948,

this creation received its first explicit statutory authorization, *see* Housing Act of 1948, 62 Stat. 1206 (1948), and was granted a monopoly over the secondary mortgage market. *Id.*

The original Fannie Mae proved to be a substantial drain on the Federal Treasury. As the Association evolved increasingly into an entity used to maintain low interest rates on certain types of mortgages, the fact that its activities were capitalized through borrowings from the Treasury created the need for successive and greater borrowing authorizations. Bartke, *Fannie Mae and the Secondary Mortgage Market*, 66 Nw.L.Rev. 1, 21 (1971).

In 1954, to alleviate this drain on the federal budget, Congress began the process which has led to the emergence of the new Fannie Mae and Ginnie Mae. In the Charter Act of 1954, 68 Stat. 612 (1954), Fannie Mae was rechartered as a federal corporation, and its functions were divided into three parts—the special assistance functions,[6] *see id.* § 305, the management and liquidation functions,[7] *see id.* § 306, and the secondary market operations. *See id.* § 304. Since it was primarily the secondary market operation which was depleting federal funds, and because it was believed that this activity could be self-supporting and privately capitalized, *see generally* Bartke, *supra*, at 21–24, only the financing of this activity was transferred from public to private hands. Thus, the special assistance functions and the management and liquidation functions of Fannie Mae continued to

---

Moreover, even if *Hancock Financial* did overrule *Acron Investments*, that disposition would still be irrelevant to our case. *Hancock Financial* could overrule *Acron Investments* only to the extent that the latter held that the FSLIC fulfilled the requirements of section 451 to enable the FSLIC to be an agency under section 1345. However, it could not possibly purport to overrule the reviser's notes to section 451 and 18 U.S.C. § 6 which are expressions of congressional intent upon which we are entitled to rely. *See United States v. National City Lines*, 337 U.S. 78, 80–81, 69 S.Ct. 955, 93 L.Ed. 1226 (1949); *Acron Investments, supra*, 363 F.2d at 240.

**6.** The special assistance functions of the old Fannie Mae, now performed by Ginnie Mae, in

essence amount to a direct federal lending program in housing markets into which private lenders would most likely not enter, such as moderate-income housing, housing in the territories or on Indian land, and housing rehabilitation. *See generally* A. Axelrod, C. Berger, & Q. Johnstone, Land Transfer and Finance (2d ed. 1978).

**7.** Ginnie Mae's management and liquidation functions, originally entrusted to the old Fannie Mae, are designed to achieve an orderly liquidation of the secondary market portfolio held by the old Fannie Mae as of November 1, 1954. *See Bartke, supra*, at 23 n.81.

be financed through borrowings from the Treasury.

This trend of dividing the Association's functions culminated in 1968 with the division of the original Fannie Mae into two separate corporate entities, the new Fannie Mae and the newly-created Government National Mortgage Association (Ginnie Mae). *See* Housing and Urban Development Act of 1968, 12 U.S.C.A. §§ 1716b, 1717(a) (West 1969 & Supp. 1979). HUD retained control over the special assistance functions and the management and liquidation functions by virtue of the Act's transfer of these operations to Ginnie Mae, which was specifically made part of HUD. *See id.* § 1717(a)(2)(A). The secondary mortgage activity was completely turned over to the new Fannie Mae, which was eventually to become completely privately financed and controlled. *See id.* §§ 1718–1719.

Ginnie Mae's special assistance functions and management and liquidations functions are financed primarily from obligations issued to the Treasury. *See id.* §§ 1720(d), 1721(d). To aid in its management and liquidation functions, the corporation is also authorized to issue public obligations whose proceeds are payable to the Treasury. *See id.* § 1721(b). Notably, "[a]ll of the benefits and burdens incident to the administration of the functions and operations of the Association [Ginnie Mae] under sections 1720 [special assistance functions] and 1721 [management and liquidation functions], respectively, of this title . . . shall inure solely to the Secretary of the Treasury . . . ." *Id.* § 1722.

Ginnie Mae's management is completely controlled by HUD:

All the powers and duties of the Government National Mortgage Association shall be vested in the Secretary of Housing and Urban Development and the Association shall be administered under the direction of the Secretary. Within the limitations of law, the Secretary shall de-

termine the general policies which shall govern operations of the Association, and shall have power to adopt, amend, and repeal bylaws governing the performance of the powers and duties granted to or imposed upon it by law.

*Id.* § 1723(a). Furthermore, the Housing and Urban Development Act of 1968 "established in the Department of Housing and Urban Development the position of President, Government National Mortgage Association, who shall be appointed by the President, by and with the advice and consent of the Senate." *Id.*

**C.**

Our examination of the functions, financing, and management of Ginnie Mae ineluctably leads to one conclusion: the interest of the United States in the corporation cannot possibly be termed to be "incidental." If anything, the Government's interest is exclusive.

Ginnie Mae controls the special assistance functions and the management and liquidation functions of the federal housing program. The history of these operations, particularly when contrasted to that of the secondary market activities, evidences an emphatic congressional intent that these functions are, and should remain, governmental functions. Congress has refused to dispense responsibility for these activities to the private sector.[8]

Ginnie Mae is financed primarily by borrowings from the Treasury. Furthermore, any profits obtained, or losses incurred, inure solely to the benefit of the federal fisc. Although Ginnie Mae is authorized to issue obligations to the public, this financing consists solely of debt financing, and thus no public interest or control, other than that of an ordinary creditor, is derived from such offerings.

Finally, Ginnie Mae's management is completely controlled by HUD. The Secretary has plenary authority to adopt the

8. The extent to which a governmental corporation performs governmental services is relevant to a determination whether the United States' interest in the entity is not incidental. *See Ramsey v. United Mine Workers of America,* 27 F.R.D. 423 (E.D.Tenn.1961).

corporation's policies and to direct its operations. It is expressly made a part of HUD, and its president is appointed by the President by and with the consent of the Senate. Governmental control over management could hardly be more complete.[9] In light of Ginnie Mae's performance of governmental function, its federal financing, and its subjection to governmental control over its management, the United States' interest in the corporation is greater than incidental. Therefore, the United States possesses the proprietary interest in Ginnie Mae sufficient to satisfy the requirements of section 451, and, as a result, Ginnie Mae is an agency within the meaning of section 1345.

### III.

The district court held that 28 U.S.C.A. § 1349 limits the reach of 28 U.S.C.A. § 1345, and that, as a result, a corporation could be an agency under section 1345 only if the United States owned more than one-half of the corporation's capital stock. The court reasoned further that since no stock in Ginnie Mae has ever been issued, the requirement of section 1349 could not be satisfied. Our close scrutiny of the language of section 1349 and our examination of its history have led us to conclude that the district court was in error.

Section 1349 stipulates that "[t]he district courts shall not have jurisdiction of any civil action by or against any corporation *upon the ground that it was incorporated by or under an Act of Congress,* unless the United States is the owner of more than one-half of its capital stock." 28 U.S.C.A. § 1349 (West 1976) (emphasis supplied). The district court has read this section as if it did not contain the language that we have emphasized. In other words, the district court's reading of section 1349 amounts to a conclusion that there can never be federal jurisdiction over a federal corporation unless the United States owns more than one-half its capital stock, and that this result obtains even if a ground for jurisdiction exists which is entirely independent of the entity's federal incorporation. Such is clearly not the law. *See, e. g., Murphy v. Colonial Federal Savings and Loan Association,* 388 F.2d 609, 611–12 (2d Cir. 1967). Section 1349 on its face limits jurisdiction over corporations only if jurisdiction is premised "upon the ground that it was incorporated by or under an Act of Congress."

Our conclusion is fully supported by section 1349's history. Section 1349 was passed in response to the decisions in *Osborn v. Bank of United States,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824), and the *Pacific Railroad Removal Cases,* 115 U.S. 1, 5 S.Ct. 1113, 29 L.Ed. 319 (1885), which held that federal incorporation is in itself a ground for federal question jurisdiction. Section 1349 was enacted "to stem 'the flood of litigation to which the federal courts were * * * subjected' as a result of the decision in *Pacific Railroad Removal Cases . . . .*" *Colonial Federal, supra,* 388 F.2d at 612. The only purpose of the section, therefore, was to limit federal incorporation as a ground for federal question jurisdiction to cases in which the United States owns more than one-half of the capital stock of the corporation. Given this purpose of section 1349, and consonant with its unmistakable language, we hold that section 1349 does not affect any jurisdictional grant other than that provided by 28 U.S.C.A. § 1331(a).[10] As a result, since Gin-

---

**9.** Although we indicate that governmental control over a corporation's management is necessary to satisfy the proviso to 28 U.S.C.A. § 1349 and that this control may be indicated by stock ownership, statutory provision, or other facts and circumstances, *see* note 10 *infra,* we do not imply that this control must exist to satisfy section 451. We look here to the Government's exclusive control over Ginnie Mae, provided by 12 U.S.C.A. § 1723(a), as a factor in determining that the United States' interest in the corporation is greater than incidental.

**10.** Even if section 1349 did apply to this case—if jurisdiction were premised upon 28 U.S.C.A. § 1331(a) rather than 28 U.S.C.A. § 1345—we would still hold that the district court has jurisdiction. The district court held that Ginnie Mae does not fall within the proviso to section 1349—that the United States does not own one-half of Ginnie Mae's capital stock—because no stock in Ginnie Mae has ever been

nie Mae is an agency within the meaning of section 1345, and because that section is unaffected by section 1349, the district court has jurisdiction over this action brought by Ginnie Mae. Thus, in this case we conclude that Ginnie Mae is not in a jurisdictional pickle.

REVERSED.

issued. Although several courts have agreed with this interpretation, *see Hancock Financial, supra,* 492 F.2d at 1328; *Crockett Mortgage Co. v. Government National Mortgage Association,* 418 F.Supp. 1081 (E.D.Pa.1976), we concur in one court's observation that such blind reliance on the literal wording of section 1349 exalts form over substance. *See Monsanto Co. v. Tennessee Valley Authority,* 448 F.Supp. 648 (N.D.Ala.1978).

As we have already noted, section 1349 was passed to diminish the flood of federal litigation that resulted from the *Pacific Railroad Removal Cases, supra,* which held that federal incorporation creates federal question jurisdiction. However, the proviso to section 1349 was added to preserve federal question jurisdiction over federally-chartered corporations in which the Government has the controlling interest. *Jackson v. Tennessee Valley Authority,* 462 F.Supp. 45, 52 (M.D.Tenn.1978) *aff'd,* 595 F.2d 1120 (6th Cir. 1979) (per curiam). Since control of a corporation normally follows from the ownership of a majority of the corporation's capital stock, the congressional use of the words "unless the United States is the owner of more than one-half of its capital stock" simply represents a short-hand expression for control. The fact that Congress in creating an entity like Ginnie Mae did not engage in the mechanical and formal process of issuing stock and then purchasing it does not detract from the conclusion that the Government controls Ginnie Mae. *See* 12 U.S.C.A. § 1723(a) (West Supp.1979). Therefore, given the control of Ginnie Mae by the United States, the proviso to section 1349 is satisfied despite the fact that there is no stock to evidence this control.

We recognize that this is possibly the clearest case to find that the United States controls a corporation that it has created without issuing stock, and that it may be less easy in future cases to pinpoint the source of control. However, this line-drawing problem must be solved in future cases based on the particular facts and circumstances of each.